**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER HINDERHAN,** )<br>)<br>**Plaintiff,** )<br>)<br>vs. )<br>)<br>**CAROLYN W. COLVIN,** )<br>**Acting Commissioner of Social Security,** )<br>)<br>**Defendant.** ) | **Case no.  4:15CV1010 PLC** |

## MEMORANDUM AND ORDER

Christopher Hinderhan ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Carolyn Colvin, denying his applications for Social Security Income and Disability Insurance Benefits under the Social Security Act.  The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (ECF No. 9).  Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

### I.      *Background and Procedural History*

In January 2012, Plaintiff filed applications for Social Security Income and Disability Insurance Benefits.[1]  (Tr. 178-84, 187-94).  The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an

---

[1] Plaintiff received Social Security benefits from February 1994 until May 2000, and from March 2001 until February 2003.  (Tr. 233).  The SSA denied Plaintiff's applications for Social Security benefits in 2002, 2005, 2010.  (Tr. 231-32).  After the denial of benefits in 2010, Plaintiff requested a hearing by an ALJ, but he failed to appear at the hearing.  (Tr. 60-63).

administrative law judge. (Tr. 88-89, 98-99). The SSA granted Plaintiff's request for review and conducted a hearing on September 6, 2013. (Tr. 35-59). In a decision dated December 13, 2013, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 27, 2011, through the date of this decision." (Tr. 27). The SSA Appeals Council denied Plaintiff's subsequent request for review of the ALJ's decision. (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Evidence Before the ALJ*

### A. *ALJ Hearing*

Plaintiff appeared with counsel, via video conference, at the administrative hearing on September 6, 2013. (Tr. 35). Plaintiff testified that he completed school through the eighth grade and did not earn a GED. (Tr. 38). Since his most recent employment ended in July 2011, Plaintiff had applied for two part-time dishwasher positions for which he was not hired. (Tr. 38).

In regard to his medical care, Plaintiff stated that he had begun treatment for his depression, bipolar disorder, and anxiety at Pathways the previous month, and he had an appointment to see a physical therapist in two weeks. (Tr. 39-40). Plaintiff explained that he experienced frequent mood swings and angered easily. (Tr. 41-42). On his bad days, which occurred about four days per week, he slept all day and, on better days, he loaded the dishwasher and cleaned the house. (Tr. 42-43, 52). Plaintiff did not have any friends and did not attend family gatherings. (Tr. 53). Plaintiff also watched movies and played "brain games" on the computer, which are "kind of like chess." (Tr. 53, 55). He was taking Seroquel and Prozac,

which helped with the depression, but "keep me pretty close to almost down. Like a zombie almost[.]" (Tr. 43).

Plaintiff testified that his bipolar disorder manifested itself in anger and caused "difficulty getting along with other people[.]" (Tr. 44). Plaintiff explained that his most recent job was as a meat clerk at Kroger's where his boss "mess[ed] with" and "antagonize[d]" him. (Tr. 44). According to Plaintiff, two days after he and his boss had an argument about Plaintiff's health benefits, Plaintiff's boss "told me that I had to start doing things differently and I had to clean more and help [with] other people's jobs." (Tr. 45). Plaintiff felt that his boss was "picking on" him, so he "told him it was unfair and he wasn't going to treat me like crap." (Id.). Shortly thereafter, Plaintiff's boss summoned him to a meeting with the assistant manager and union representative, who were "just sitting there talking crap to me." (Id.). Plaintiff stated that he "started shaking and [] turned red" and he "was ready to hurt [his boss]." (Tr. 46). Plaintiff told his boss to get out of his way, threatened to "put his head through the glass door," and stormed out, slamming the door and breaking the glass. (Tr. 45-46). Plaintiff testified that he quit later that day. (Tr. 46).

In regard to his anxiety, Plaintiff testified that he suffered anxiety attacks that felt "like I'm having a heart attack." (Tr. 47). "Negative drama" and "[i]nteracting with other people" triggered the attacks. (Tr. 47). Plaintiff avoided crowds, shopping, and leaving the house. (Tr. 48).

Plaintiff testified that he began experiencing back problems when he was eighteen years old. (Tr. 48). In the last twelve years, the pain had intensified to the point that Plaintiff had "gotten on my knees and cried…[a]nd like prayed to God…to make the pain go away[.]" (Tr. 49). Plaintiff stated that "it's been that extreme for about 12 years now" and he "would wolf

down Ibuprofen and Aspirin, Motrin, Tylenol…like it's candy just to take the pain away." (Id.). Plaintiff recently started taking Voltaren, which helped. (Tr. 50).

Additionally, Plaintiff stated that he suffered memory problems that prohibited him from working. (Tr. 51). Plaintiff had an appointment to see a neurologist the following month. (Id.). He explained, "I can't tell you what I ate for dinner last night. . . . It's like I have the memory of an 80-year-old man with whatever that memory thing is called[.]" (Tr. 52). Plaintiff's caseworker at Pathways assisted him with keeping his appointments. (Id.).

Because the vocational expert, Susan Hullender, was not present at the hearing, the ALJ issued her interrogatories. (Tr. 58). The ALJ asked Ms. Hullender to consider a hypothetical individual with Plaintiff's age (thirty-six years), education, and work history, and the residual functional capacity (RFC) to perform work at all exertional levels "except is able to perform work at up to General Education Development reasoning level of two in the OT."[2] (Tr. 320). Ms. Hullender opined that such individual could perform all of Plaintiff's past work, except that of a cashier, which required interaction with the public. (Tr. 320-21). Ms. Hullender stated that Plaintiff could also work as a racker, bottling line attendant, or egg washer. (Id.).

B. *Relevant Medical Records*

On December 11, 2011, the day after his wife left him for another man, Plaintiff presented to the emergency room at Phelps County Regional Medical Center with suicidal

---

[2] In the interrogatories, the ALJ explained that "work at up to General Education Development reasoning level of two" requires

> that the worker apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables; is limited to occasional superficial, non-confrontational and non-negotiation types of interaction with coworkers and supervisors; is limited to work that does not involve team effort in decision making, development of goals and priorities, building of a consensus, or negotiated outcomes; and cannot work with the general public.

(Tr. 320).

ideations. (Tr. 223-35). Doctors transferred Plaintiff to Jefferson Regional Medical Center, where Plaintiff was admitted for treatment. (Tr. 342-55). On December 12, 2011, Dr. Ahmad Ardekani completed a psychiatric evaluation for Plaintiff, noting that Plaintiff's insight and judgment were impaired, but his general knowledge and intellectual function were "okay." (Tr. 342). Dr. Ardekani diagnosed Plaintiff with bipolar affective disorder, mixed; panic anxiety; and possible dependent personality. (Tr. 343). Dr. Ardekani stated that Plaintiff required "some medicine" and "extensive psychotherapy." (Tr. 346). Dr. Ardekani observed on December 14, 2011 that Plaintiff's mood had improved such that he was no longer suicidal, and the following day, Plaintiff was "smiling, interacting." (Tr. 348, 349). Nurses' notes from Plaintiff's hospitalization state that, on December 13, 2011, Plaintiff was "interacting with peers and has spent a great deal of time with one select female peer." (Tr. 353). Dr. Ardekani assessed a GAF score of 40,[3] indicating serious symptoms, and discharged Plaintiff on December 16, 2011 with prescriptions for Seroquel and Clonazepam. (Tr. 350).

---

[3] A GAF score represents a clinician's judgment of an individual's overall ability to function in social or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate some impairment in reality testing or communication or a major impairment in social or occupational functioning; scores of 41-50 reflect a serious impairment in these functional areas; scores of 51-60 indicate a moderate impairment; and scores of 61-70 indicate a mild impairment. Id.

The Court notes that DSM-V was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" Alcott v. Colvin, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing Rayford v. Shinseki, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM-V)). However, because the DSM-IV "was in use when the medical entries were made and the [ALJ's] decision was issued in this matter, the Global Assessment of Functioning scores remain relevant for consideration in this appeal." Rayford, 2013 WL 3153981, at * 1 n.2.

On January 17, 2012, Plaintiff went to Mercy St. John's clinic and requested a refill on his medications. (Tr. 361). Plaintiff received a refill and a referral to a psychiatrist at Pathways. (Id.).

On April 12, 2012, Dr. Heather Derix, Psy.D., completed a consultative psychological evaluation for Plaintiff at the request of the SSA. (Tr. 380-88). Plaintiff informed Dr. Derix that he received Social Security as a child, but he lost coverage when he married at age twenty-three. (Tr. 380). He stated that he received some special education and dropped out of school in tenth grade. (Tr. 382-83). Plaintiff explained that he participated in individual and family therapy when he "used to get social security" but "can't afford therapy now." (Tr. 383). He was currently taking Citalopram, which "used to work" and Klonopin, which "works great." (Id.).

Plaintiff informed Dr. Derix that he suffered pain related to "three broken discs in my spine." (Id.). He also had "titanium in [his] arm" because he shattered it when he "got mad and flipped over a 2,000 pound soda machine." (Id.). He explained that he had not "seen a doctor in a good 20 something years," and he did not take medications for physical problems. (Id.).

In regard to his employment history, Plaintiff explained that he had difficulty maintaining employment because "I have a problem getting along with others, I don't play nice, I like to do things on my own. I don't like someone to tell me what to do." (Tr. 384). His daily routine involved awaking at 7:00 or 8:00 a.m., taking his antidepressant, and going back to sleep until "1 or 3 or 4 if I'm tired." (Tr. 385). Defendant reported that he did housework when his mother left him a to-do list and stated, "I do like to keep the floors clean, and my laundry clean." (Id.).

In her summation, Dr. Derix observed:

> The claimant was able to understand and remember simple instructions; had no difficulty with concentration and persistence on simple tasks; demonstrated extreme impairment in his capacity to interact in limited contact situations with the general public; demonstrated extreme impairments in his capacity to

> interact in limited contact situations with supervisors and coworkers, is likely to struggle with adapting to a simple environment (due to difficulties with socialization and subsequent anxiety); was capable of managing funds independently and appeared to be a generally reliable informant.

(Tr. 387). Dr. Derix diagnosed Plaintiff with: bipolar disorder I, most recent episode depressed; panic disorder with agoraphobia; and nicotine dependence. (Tr. 386). She assessed a GAF score of 40-45. (Id.).

On March 10, 2012, Plaintiff presented to the emergency room claiming that he "was at the bar last night and then 'woke up in the dirt at the courthouse' ~ 3 a.m." after he "was beat up." (Tr. 416-21). Plaintiff was intoxicated and complained of pain in his face and neck. (Tr. 416).

On April 16, 2012, Dr. Deborah Doxsee, PhD, a state agency psychological consultant, completed a psychiatric review technique based upon her review of Plaintiff's records and adult function report. (Tr. 65-74). Dr. Doxsee determined that Plaintiff suffered an affective disorder and anxiety disorder, which caused moderate restrictions or difficulties in activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. 69). Dr. Doxsee also noted "one or two" episodes of decompensation of extended duration. (Id.). Dr. Doxsee deemed Plaintiff's reports of limitations "partially credible." (Tr. 71).

Dr. Doxsee assessed Plaintiff's mental RFC and found Plaintiff was either "not significantly limited" or "moderately" limited in all four categories of limitations (i.e., understanding and memory, sustained concentration and persistence, social interaction, and adaptation). (Tr. 71-73). Dr. Doxsee noted that Dr. Derix assessed more restrictive limitations, but she believed that Dr. Derix "relie[d] heavily on the subjective reports of symptoms and limitations provided by the individual" and "overestimate[d]…the severity of the individual's

restrictions/limitation . . . ." (Tr. 73). Dr. Doxsee concluded that Plaintiff was "limited to unskilled work because of the impairments" but was not disabled. (Tr. 74).

On April 24, 2012, Plaintiff attempted to establish care with and obtain a mental and physical disability determination from Dr. Bohdan Lebedowicz. (Tr. 471-73). Dr. Lebedowicz declined to complete Plaintiff's disability papers and referred him to a psychiatrist. (Tr. 472). When Dr. Lebedowicz asked Plaintiff "if he needs any help with his back pain," Plaintiff "said that he doesn't and he does not want to have any medication for it." (Id.).

On August 1, 2012, Plaintiff presented to the emergency room complaining of "mid and lower back pain" and requesting medication. (Tr. 412). Dr. Earl Scott wrote that "[u]pon further investigation," he learned that Plaintiff had "received tramadol from his PCP for treatment of chronic back pain." (Tr. 415). Plaintiff admitted he received a prescription on July 10, stated that he still had medication, and requested a referral for a new primary care provider. (Id.).

On August 8, 2012, Plaintiff saw a new primary care provider, Dr. Salim Shakhour. (Tr.465-69). Plaintiff complained of "stabbing" lower back pain and rated his pain eight on a ten-point scale. (Tr. 466). Plaintiff stated that he was currently taking Celexa and Clonazepam, but he wished "to be tapered off" of Clonazepam because "he did not like the way it makes him feel." (Tr. 467). Finally, Plaintiff reported "bi-frontal pressure headaches involving his frontal sinuses." (Id.). Dr. Shakhour referred Plaintiff to a pain clinic, psychiatry clinic, and allergy clinic; prescribed Klonopin, Celexa, Seroquel Xr, and Zyrtec (for chronic allergic sinusitis); and ordered x-rays. (Tr. 468). X-rays of Plaintiff's lumbar spine were "unremarkable." (Tr. 471).

Plaintiff visited an allergist on August 28, 2012 who diagnosed rhinitis and prescribed an inhaler. (Tr. 429-30). A pulmonary function report revealed mild restrictive ventilator defect. (Tr. 432). Plaintiff returned on September 11, 2012, with shortness of breath and wheezing, and

on November 26, 2012, with severe sinus pressure. (Tr. 428-29). The allergist diagnosed Plaintiff with acute sinusitis, seasonal allergic rhinitis, asthma, and chronic obstructive pulmonary disease (COPD). (Tr. 428). Plaintiff called the office on December 17, 2012 and reported a continued sinus infection. (Id.).

On September 6, 2012, Plaintiff returned to Dr. Shakhour's office for a follow-up appointment regarding his back pain. (Tr. 461-64). Plaintiff complained that his back pain was eight out of ten, and Dr. Shakhour prescribed Flexeril. (Tr. 463). On September 11, 2012, Plaintiff underwent an MRI of his lumbar spine, which was "unremarkable." (Tr. 435).

In October 2012, Plaintiff sought treatment for pain in his left ankle and right knee at the Phelps County Medical Center. (Tr. 454-56). Dr. Keith Frederick diagnosed Plaintiff with patellofemoral arthralgia, right knee and left ankle pain of uncertain etiology. (Tr. 455). X-rays of Plaintiff's knee and ankle were "unremarkable." (Tr. 457-58). Plaintiff declined a prescription for an anti-inflammatory drug, so the orthopedist recommended Tylenol. (Tr. 456).

Plaintiff went to the emergency room on December 2, 2012, claiming he had been assaulted outside of his home and complaining of injuries to his right hand, head, and face, including a laceration on his chin that required three stitches. (Tr. 402-07). A nurse practitioner also diagnosed Plaintiff with sinusitis and prescribed amoxicillin and a nasal spray. (Tr. 407).

When Plaintiff returned to Dr. Shakhour's office for a follow-up appointment on December 21, 2012, he complained of dizziness and pain in his right hand. (Tr. 449-53). An x-ray of Plaintiff's hand revealed a fracture, and Dr. Shakhour referred Plaintiff to the orthopedic surgery clinic and the neurology clinic. (Tr. 452). Dr. Shakhour continued the Flexeril for Plaintiff's back pain. (Id.).

On August 8, 2013, Plaintiff sought psychotherapy in an unscheduled appointment at Pathways. (Tr. 483). In his pre-intake meeting with Gene Schaefer, CSS, Plaintiff appeared anxious and reported that he had run out of medications.[4] (Id.). Mr. Schaefer assessed Plaintiff with a GAF of 44 and referred him to a Pathways social worker. (Id.).

Laura Sanchez, CSS, a social worker from Pathways, met with Plaintiff at his home on August 15, 2013 to complete paperwork and build rapport. (Tr. 482). Plaintiff informed her that he needed "help getting back on my medicine" and "getting along with society." (Id.). Ms. Sanchez returned to Plaintiff's home on August 19, 2013 to discuss Plaintiff's strengths and goals for service. (Tr. 481). Plaintiff "presented a slightly depressed mood" and stated he felt "worthless" and needed help "trusting people and being social." (Id.).

On August 21, 2013, Ms. Sanchez accompanied Plaintiff to Pathways for his psychiatric evaluation appointment with Dr. Sreekant Kodela. (Tr. 478-79). At that appointment, Plaintiff reported some improvement with his past medications but described symptoms of depression, posttraumatic stress disorder, obsessive compulsive disorder, hypomania, as well as auditory and visual hallucinations. (Tr. 475-77). Plaintiff denied suicide attempts and cutting behavior. (Tr. 475). Dr. Kodela observed that Plaintiff appeared depressed and anxious, but was well-groomed, maintained reasonable eye contact, and exhibited reasonable perception, attention, and judgment. (Tr. 476). Dr. Kodela diagnosed Plaintiff with bipolar disorder II, assessed Plaintiff with a GAF score of 50, and prescribed Seroquel and Prozac. (Tr. 477).

The following day, on August 22, 2013, Pathways social worker Erin Ellis, CSS arrived at Plaintiff's home to accompany him to his Healthcare Home program appointment at Pathways. (Tr. 474). Plaintiff was sleeping when she arrived and explained that "a new medication,

---

[4] Plaintiff informed Mr. Schaefer that he had been receiving psychiatric services from "Dr. Baquero at the Center Clinic" and "discovered that [the doctor] had left the practice." (Tr. 483). A review of the record reveals no documentation of this treatment.

Seroquel,…made him very 'drunk like feeling.'" (Id.). Plaintiff rescheduled the appointment for the following week. (Id.).

On September 13, 2013, Plaintiff sought treatment for his chronic back pain from Dr. Savita Thorat at a Mercy Family Medicine Clinic. (Tr. 488-89). Dr. Thorat prescribed Voltaren and Zanaflex, referred Plaintiff to physical therapy and a pain clinic, and scheduled a one-month follow-up appointment. (Tr. 488).

### III.    Standards for Determining Disability Under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

## IV.    The ALJ's Determination

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920 and found that Plaintiff:  (1) had not engaged in substantial gainful activity since July 27, 2011; (2) had the severe impairments of bipolar disorder, panic disorder with agoraphobia, mild intermittent asthma, and obesity; (3) had the non-severe impairments of chronic rhinitis, right middle finger fracture, status post right forearm fracture with surgery, and chronic back pain; and (4) did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 13-27).

The ALJ found that Plaintiff's mental impairments resulted in:  mild restrictions on his activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. 18-19).  The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, with the following nonexertional limitations:

> He is able to perform work at up to General Education Development reasoning level of two in the Dictionary of Occupational Titles, which is defined as work that requires that the worker apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables.  He is limited to occasional superficial, non-confrontational and non-negotiation types of interactions with coworkers and supervisors.  The claimant is also limited to work that does not involve team effort in decision making, development of goals and priorities, building of a consensus, or negotiated outcomes.  He cannot work with the general public.

(Tr. 19-20).  The ALJ noted that Plaintiff, who was thirty-seven years of age, testified that he: experienced mood swings and anxiety attacks; felt angry; had difficulty getting along with others; and suffered approximately four bad days per week, during which he stayed on the couch and slept all day.  (Tr. 20).  Although the ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause some of the alleged symptoms," he believed Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not generally credible . . . ." (Tr. 20-21).

The ALJ explained that "inconsistencies in the record tended to diminish" Plaintiff's credibility. (Tr. 21). For example, Plaintiff testified that he suffered chronic, severe back pain since he was a teenager, but there was little evidence that Plaintiff sought treatment for back pain and the images revealed no abnormalities. (Id.). Plaintiff also testified that his medications made him "[l]ike a zombie almost," but his medical records did not reflect adverse side effects. (Id.). In addition, Plaintiff alleged a history of mental impairments since childhood, but he neither received treatment nor took medications for mental illness during his twelve-year marriage, and he received no "regular and consistent" mental health treatment prior to August 2013. (Id.). Finally, the ALJ noted that various inconsistencies in Plaintiff's reporting of his own history (such as the extent of his education, reasons for his most recent termination, and use of drugs and alcohol) decreased "the credibility of [Plaintiff]'s other testimony." (Id.).

The ALJ reviewed Plaintiff's medical records and determined that Plaintiff was "non-compliant with treatment recommendations" and that the clinical and objective findings in the record were inconsistent with Plaintiff's allegations of total debilitation. (Tr. 21-22). Nor did the record "contain any opinions from treating physicians indicating that [Plaintiff] is disabled or even has greater limitations than those determined in this decision." (Tr. 24). The ALJ assigned Dr. Derix's opinion "partial weight," because Dr. Derix met Plaintiff only once and her opinions regarding Plaintiff's social functioning and GAF scores were based on Plaintiff's "subjective reports of symptoms and limitations" and unsupported by the totality of the evidence. (Id.).

The ALJ also assigned "partial weight" to Dr. Doxsee's medical opinion and the GAF scores in the record, which the ALJ found "suggest. . . moderate limitations in functioning." (Id.). The ALJ noted that Plaintiff's most recent GAF score of 50, assessed by Dr. Kodela in August 2013, was "a borderline score[,] since 51 indicates moderate symptoms and limitations," and inconsistent with Dr. Kodela's mental status exam, which "was essentially normal." (Id.). The ALJ also limited the weight given Plaintiff's GAF scores because an accurate GAF score is "dependent on the truthfulness of the claimant with each examiner" and "there are several inconsistencies in [Plaintiff's] reporting." (Id.).

At step four of the five-step evaluation process, the ALJ determined that "[t]ransferability of job skills is not an issue because [Plaintiff] does not have past relevant work." (Tr. 26). In the final step, the ALJ noted that Plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations." (Id.). The ALJ concluded: "[C]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 27).

## V.    Standard for Judicial Review

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's

determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## VI.    Discussion

Plaintiff claims the ALJ erred in: (1) assigning only partial weight to the consultative psychologist's medical opinion; and (2) creating an RFC unsupported by substantial medical evidence.[5]    The Commissioner counters that the ALJ properly assessed the consulting psychologist's medical opinion, discredited Plaintiff's subjective complaints, and formulated an RFC based upon substantial evidence of record.

### 1. Expert medical opinions

Plaintiff argues the ALJ erred in assigning only partial weight to the medical opinion of the consultative examining psychologist, Dr. Derix. More specifically, Plaintiff contends that the ALJ's "reasons for discounting Dr. Derix's opinion of [Plaintiff's] disabling limitations are not supported by substantial evidence." In response, the Commissioner asserts that the ALJ properly

---

[5] Plaintiff challenges the RFC only in regard to the ALJ's assessment of his mental limitations. Plaintiff does not contest the ALJ's determination of the degree to which his physical impairments affected his RFC.

evaluated the medical opinion and other evidence and substantial evidence of record supports the RFC finding.

In determining a claimant's disability, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 404.1527(c), (e)(2)(ii); 416.927(c), (e)(2)(ii). When determining the appropriate amount of weight to give a medical opinion from a non-treating source, the ALJ considers the following factors: examining relationship, treatment relationship, supportability, consistency, and specialization. Wiese v. Astrue, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Dr. Derix interviewed Plaintiff on April 12, 2014. (Tr. 380). During the interview, Plaintiff described his present mental health condition and discussed his family, educational, psychiatric, medical, employment, and social histories. (Tr. 380-85). Based on this interview, Dr. Derix completed a mental status examination, which stated that Plaintiff exhibited "flat emotion and affect," fair eye contact, normal speech, and questionable insight and judgment. (Tr. 385). Dr. Derix found that Plaintiff "appeared to be a decent historian." (Id.). In regard to intellectual ability, Dr. Derix found that Plaintiff: appeared to be functioning in the average range of intellectual ability; demonstrated adequate abstract processing; and displayed no memory problems or receptive or expressive language deficits. (Id.). Dr. Derix diagnosed

Plaintiff with bipolar disorder and panic disorder with agoraphobia, and she assessed a GAF of 40-45. (Tr. 386).

In her recommendation, Dr. Derix wrote that Plaintiff "was able to understand and remember simple instructions" and "had no difficulty with concentration and persistence on simple tasks[.]" (Tr. 387). However, Dr. Derix stated that Plaintiff "demonstrated extreme impairment" in his capacity to interact in limited contact situations with coworkers, supervisors and the general public and would likely struggle with "adapting to a simple environment (due to difficulties with socialization and subsequent anxiety)[.]" (Id.). Finally, Dr. Derix concluded that Plaintiff "appeared to be a generally reliable informant." (Id.).

The ALJ thoroughly reviewed Dr. Derix's psychological evaluation and explained his reasons for assigning her medical opinion "partial weight." (Tr. 24-25). The ALJ noted that Dr. Derix interviewed Plaintiff only once, "so this opinion is . . . based on a snapshot of [Plaintiff's] functioning . . . ." (Tr. 25). The ALJ rejected Dr. Derix's opinions regarding social functioning and Plaintiff's GAF scores because they "appear to rely heavily on [Plaintiff's] subjective reports of symptoms and limitations." The ALJ's decision to discount Dr. Derix's opinion to the extent she relied upon Plaintiff's reporting was reasonable given that the ALJ determined Plaintiff's statements regarding his symptoms and limitations were "not generally credible." Plaintiff does not challenge this credibility finding.

The ALJ also discredited Dr. Derix's opinion regarding Plaintiff's social functioning because it was not consistent with "the totality of the evidence, including Dr. Derix's mental status examination of [Plaintiff] . . . ." (Tr. 24). For example, in her mental status examination, Dr. Derix noted that Plaintiff was "engaged" and "presented with no apparent physical or mental distress." (Tr. 385, 387). Additionally, Plaintiff told Dr. Derix, "if I am on the right amount of

antidepressant and medication, when I was on it, I was very happy, I seemed to be even," "anxiety medicine and music help me," and "Klonopin works great." (Tr. 380, 381, 383). Finally, as the ALJ wrote in his decision, "the fact that [Plaintiff] was able to strike up a friendship with a female peer on the unit during his December 2011 hospitalization" suggested that Dr. Derix overstated the severity of Plaintiff's limitations.

Importantly, the ALJ did not entirely discount Dr. Derix's opinion, but rather assigned it partial weight. Indeed, the ALJ's RFC assessment, which imposed nonexertional limitations upon his reasoning, problem-solving, and interpersonal interactions, demonstrates that the ALJ did give some weight to this opinion evidence. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided good reasons for the weight he accorded Dr. Derix's opinion. Because substantial evidence on the record as a whole supports the ALJ's determination to assign Dr. Derix's opinion partial weight, the Court will not disturb that determination.

   *2. RFC*

Plaintiff claims that, after the ALJ assigned only partial weight to Dr. Derix's opinion, Dr. Doxsee's opinion, and the GAF scores in the record, he "failed to point to any medical evidence to support the RFC assessment[.]" Plaintiff further contends that the ALJ improperly based the RFC finding entirely upon Plaintiff's "lack of mental health treatment and [his] ability to interact in a hospital setting." The Commissioner counters that the ALJ properly evaluated the medical opinion and other evidence and his RFC was supported by substantial evidence of record.

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1). See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 2016 WL 3878219, at *3 (8th Cir. 2016) (quoting Cox v Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." Id. Nor is an ALJ limited to considering medical evidence exclusively when evaluating a claimant's RFC. Cox, 495 F.3d at 619. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall, 274 F.3d at 1217.

Plaintiff argues that "no medical evidence supports the ALJ's conclusion that [Plaintiff] was impaired only to the extent that he could still have occasional superficial contact with coworkers and supervisors and no contact with the general public[.]" To the contrary, Dr. Doxsee reviewed Plaintiff's medical records and completed a RFC assessment, which supports the ALJ's RFC determination. (Tr. 71-74). In regard to Plaintiff's social functioning, Dr. Doxsee found Plaintiff: "moderately limited" in his ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors; and "not significantly limited" in his ability to ask simple questions, request assistance, get along with coworkers or peers without distracting them or exhibiting behavior extremes, and maintain

socially appropriate behavior.  (Tr. 74).  Dr. Doxsee wrote:  "He can interact adequate[ly] with peers and supervisors."[6]  (Id.).

Importantly, the ALJ did not entirely discount Dr. Doxsee's medical opinions.  Rather, he assigned that opinion "partial weight" to the extent that it was consistent with the ALJ's assessment of Plaintiff's mental functioning.  The ALJ found:

> [Dr. Doxsee's] opinions are generally consistent with the preponderance of the evidence, that although he was referred to mental health providers several times after his December 2011 hospitalization, [Plaintiff] did not follow-up with these referrals until the month prior to the hearing.  He has also reported improvement with psychotropic medications.

Accordingly, Dr. Doxsee's medical opinion satisfies the requirement that "some medical evidence of the claimant's ability to function in the workplace" support the ALJ's RFC findings.  See, e.g., Cox, 495 F.3d at 620.

Furthermore, in formulating Plaintiff's RFC, the ALJ accounted for Plaintiff's mental impairment by including the following nonexertional limitations:  "he is able to perform work at up to General Education Development reasoning level of two in the Dictionary of Occupational Titles, which is defined as work that requires that the worker apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables."  (Tr. 26).  The ALJ also accounted for limitations on Plaintiff's social functioning, writing:  "He is limited to occasional superficial, non-confrontational and non-negotiation types of interactions with coworkers and supervisors.  The claimant is also limited to

---

[6] Plaintiff also argues that the ALJ erred in failing to include in the RFC limitations on Plaintiff's ability to adapt.  In regard to Plaintiff's adaptation limitations, Dr. Doxsee found him: "moderately limited" in his ability to respond appropriately to changes in the work setting, set realistic goals, and make plans independently of others; and "not significantly limited" in his ability to be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, and use public transportation.  (Tr. 72-73).  Dr. Doxsee concluded:  "He can adapt to most usual changes common to a competitive work setting."  (Tr. 73).  Therefore, Dr. Doxsee's opinion supported the ALJ's decision not to include adaptation limitations in Plaintiff's RFC.

work that does not involve team effort in decision making, development of goals and priorities, building of a consensus, or negotiated outcomes. He cannot work with the general public." (Tr. 26).

Plaintiff likens his case to Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001) and Hutsell v. Massanari, 259 F.3d 707 (8th Cir. 2001). In those cases, the United State Court of Appeals for the Eighth Circuit reversed the denial of benefits because the records contained no medical evidence to support the ALJs' assessments of the degree to which the plaintiffs' mental impairments affected their RFCs. Lauer, 245 F.3d at 706; Hutsell, 259 F.3d at 713. The instant case is distinguishable because Dr. Doxsee's medical opinion supports the ALJ's RFC determination.

Finally, Plaintiff asserts that, in giving "partial weight" to the GAF scores in the record, the ALJ improperly substituted his opinion for that of the medical professionals. "GAF scores may be relevant to a determination of disability based on mental impairments." Mabry v. Colvin, 815 F.3d 386, 391 (8th Cir. 2016) (citing Pates-Fire, 564 F.3d at 944-45). However, "[i]n recent years, the [SSA] has recognized, and we have noted, that GAF scores have limited importance." Nowling v. Colvin, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016) (citing Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)).

In this case, the ALJ carefully considered the GAF scores in the record and found they conflicted with other objective medical evidence in the record. For example, the ALJ explained that Plaintiff's most recent GAF score of 50 "appears to be a low assessment since Dr. Kodela's mental status exam was essentially normal." (Tr. 25). In regard to Plaintiff's GAF score of 40 at the time of his discharge after the December 2011 hospitalization "appeared to be inconsistent with the progress notes during that stay." (Id.). The ALJ did not entirely discount the GAF

scores in the record, but found them credible to the extent "they suggest that the claimant has moderate limitations in functioning." (Id.). In any event, Plaintiff's GAF score of 50 is consistent with the limitations the ALJ placed upon Plaintiff's interactions with coworkers, supervisors, and the general public. (Tr. 19-20). See, e.g., Mabry, 815 F.3d at 391.

Based on the foregoing, the record contains adequate medical opinion evidence and other medical evidence to support the ALJ's RFC assessment. Although Plaintiff cites evidence that might support a contrary decision, substantial evidence supports the ALJ's RFC determination and, as such, this Court is required to affirm.

## VII. Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of September, 2016